UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DONYELL MCKENZIE,

                        Plaintiff,

        v.

HOPE OBERTEAN, *Nurse Practitioner*,

                 Defendant.

_____

**DECISION AND ORDER**

1:17-CV-00441 EAW

## <u>INTRODUCTION</u>

Plaintiff Donyell McKenzie ("Plaintiff") asserts a claim against defendant Hope Obertean ("Defendant") for violation of his Fourteenth Amendment right to refuse medical treatment.  (Dkt. 12; Dkt. 15).  The matter has been referred to Magistrate Judge Hugh B. Scott for all pre-trial matters excluding dispositive motions.  (Dkt. 24).

Currently pending before the Court are: (1) Plaintiff's objections (Dkt. 41) to Judge Scott's Decision and Order dated February 5, 2019 (Dkt. 39) denying Plaintiff's motions for leave to file a supplemental complaint and for leave to file an amended complaint (Dkt. 22; Dkt. 26); (2) Plaintiff's objections (Dkt. 56) to Judge Scott's Text Order dated August 26, 2019 (Dkt. 55) denying without prejudice Plaintiff's motion for discovery (Dkt. 52); and (3) Defendant's motion for summary judgment (Dkt. 59).  For the reasons set forth below, the Court denies Plaintiff's objections to Judge Scott's orders and grants Defendant's motion for summary judgment.

- 1 -

## FACTUAL BACKGROUND

The following facts are taken from Defendant's papers and exhibits submitted in support of her motion for summary judgment and Plaintiff's papers and exhibits submitted in opposition thereto.  Unless otherwise noted, these facts are undisputed.

At all times relevant to this action, Plaintiff was an inmate in the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and was housed at the Wende Correctional Facility ("Wende").  (Dkt. 59-2 at ¶ 1; Dkt. 61-1 at ¶ 2).  During that same time period, Defendant was employed at Wende as a nurse practitioner.  (Dkt. 59-2 at ¶ 2; Dkt. 61-1 at ¶ 1).

Plaintiff has a history of uncontrolled hypertension with "dangerously high blood pressure" dating back at least to October of 2009, when he was only 38 years old.  (Dkt. 59-2 at ¶ 4; Dkt. 61-1 at ¶ 4).  The parties dispute the cause of Plaintiff's condition—Defendant asserts Plaintiff's high blood pressure is the result of a poor diet, lack of compliance with prescribed medication, and failure to engage in exercise or other lifestyle changes (Dkt. 59-2 at ¶ 4), while Plaintiff maintains that although he does not always agree with his medical doctors, he has "never ignored the fact" that he is hypertensive and has tried to treat his condition with exercise and a "decent diet of [his] choosing" (Dkt. 61-1 at ¶ 4).

DOCCS Health Service Policy 7.18 ("Policy 7.18"), which is entitled "Refusal of Health Care," acknowledges an inmate's right to refuse medical treatment after counseling about the risks and possible consequences of such refusal.  (Dkt. 59-2 at ¶ 7; Dkt. 61-1 at ¶ 7).  Pursuant to Policy 7.18, when an inmate refuses health care, he must sign DOCCS

Form 3195, "Refusal of Medical Examination and/or Treatment."  (Dkt. 59-3 at 293).

Plaintiff's medical records reflect that he has frequently been counseled and educated on

the consequences of refusing medication for his high blood pressure, including the

associated risk of stroke, heart attack, renal failure, and death.  (Dkt. 59-2 at ¶ 8; Dkt. 61-

1 at ¶ 8).   Plaintiff has nevertheless repeatedly exercised his right to refuse such

medications.  (Dkt. 59-2 at ¶ 8; Dkt. 61-1 at ¶ 8).

Plaintiff's claim against Defendant arises out of an incident that occurred on July

21, 2016.  (Dkt. 12 at 3-4).   On that date at approximately 8:10 a.m., Defendant's blood

pressure was measured at 202/116, which constitutes a hypertensive crisis.  (Dkt. 59-2 at

¶ 22; Dkt. 61-1 at ¶ 22).   The parties dispute who took the blood pressure reading—

Defendant states that she did, while Plaintiff maintains that a different nurse performed a

"basic check-up" before he was seen by Defendant.  (Dkt. 59-2 at ¶ 22; Dkt. 61-1 at ¶ 22).

Plaintiff became "agitated" and refused any medical examination or treatment by

Defendant.  (Dkt. 59-2 at ¶ 23; Dkt. 61-1 at ¶ 23).   Plaintiff contends his agitation was the

result of Defendant refusing to listen when he told her he had previously experienced an

allergic reaction—namely, swelling of his feet—to Norvasc, the high blood pressure she

wanted him to take.  (Dkt. 61-1 at ¶ 23)[1].   Defendant then placed Plaintiff in the infirmary

for observation; he was admitted at 9:05 a.m.  (Dkt. 59-2 at ¶ 25; Dkt. 61-1 at ¶ 25).

---

[1]     Defendant acknowledges that Plaintiff complained about feet swelling when taking
Norvasc, but denies that this constituted an allergic reaction.  (Dkt. 59-3 at ¶¶ 20-21).
Instead, Defendant states that swelling is a known side effect of Norvasc and that a side
effect is distinct from an allergic reaction.  (*Id*.).

Defendant states that it is "standard practice to observe and monitor inmates in jeopardy of catastrophic medical events in the infirmary." (Dkt. 59-3 at ¶ 26).

Plaintiff's medical records indicate that after Plaintiff was admitted to the infirmary on July 21, 2016, non-party Nurse J. Radder ("Nurse Radder") counseled him on the potential consequences of refusing to take the high blood pressure medication Defendant had prescribed for him. (Dkt. 59-3 at 187). On the Form 3195, Plaintiff wrote:

> After refusing and expressing my concerns I was still forced to go to the infirmary against my will. I specifically stated that I did not want to go to or be treated in the infirmary. I was then forced into the infirmary and told that I could not leave until I took medication to make my blood pressure go down. Under these circumstances I will take HCTZ 25 as it seems to be the most common and safest option. Only because I'm being forced. I am scared that I will be kept in the infirmary for an extensive amount of time if I don't take them. I could receive a ticket for refusing a direct order if I wouldn't have complied with the officers involved. And I will take 1 Colnin [sic—Plaintiff is referring to the high blood pressure medication Clonidine] as need. I specifically refuse to be in the infirmary as well as take medications that are detrimental to me. This situation also interfered with my legal access as I am scheduled for law library and I am in the middle of motions and appeals. And I was told that I could not have access to my legal materials for at least 72 hours.

(*Id.*).

Plaintiff's medical records indicate that Defendant ordered Clonidine at 11:50 a.m. (*Id.* at 184), although Defendant contests the timing (Dkt. 61-1 at ¶ 34). Plaintiff took a dose of Clonidine at some point during the morning of July 21, 2016. (Dkt. 59-3 at 158). According to Plaintiff's medical records, at 1:30 p.m., he also agreed to accept HCTZ. (*Id.*). Plaintiff's medical records further reflect that a second dose of Clonidine was ordered by non-party Dr. Levitt at 9:30 p.m., at which time Plaintiff's blood pressure was 170/100.

(*Id.*).  The following morning, at 8:00 a.m., Plaintiff refused a dose of Norvasc.  (*Id.*).  He was discharged from the infirmary on July 22, 2016, at 10:40 a.m.  (*Id.*).

## PROCEDURAL BACKGROUND

Plaintiff commenced the instant action on May 18, 2017.  (Dkt. 1).  The operative pleading is the second amended complaint, filed on April 20, 2018.  (Dkt. 12).  On June 1, 2018, the Court entered a Decision and Order permitting Plaintiff's claim against Defendant for violation of his Fourteenth Amendment right to refuse medical treatment to proceed to service.  (Dkt. 15).  All of Plaintiff's other claims were dismissed with prejudice.  (*Id.*).

On August 13, 2018, Plaintiff filed a motion for leave to file a supplemental complaint.  (Dkt. 22).  Specifically, Plaintiff sought leave to add a cause of action related to incidents on May 10, 17, 22, and 30, 2018, where he refused medical treatment because he did not want to interact with Defendant.  (*Id.* at 2-3).  Plaintiff claims that Defendant was scheduling "excessive callouts" in an effort to force him to comply with her orders.  (*Id.* at 4).

Defendant filed her answer to the second amended complaint on August 31, 2018.  (Dkt. 23).  The matter was referred to Judge Scott that same day.  (Dkt. 24).

On September 4, 2018, Plaintiff filed a motion for leave to file an amended complaint.  (Dkt. 26).  Plaintiff again sought leave to add additional claims based on the incidents in May 2018 where he claims that Defendant scheduled him for excessive callouts.  (*Id.* at 5-10).

Defendant filed a response to Plaintiff's motion for leave to file a supplemental complaint and motion for leave to file an amended complaint on September 27, 2018.  (Dkt. 31).  Plaintiff's reply papers were docketed on October 15, 2018.  (Dkt. 35).

On February 2, 2019, Judge Scott entered a Decision and Order denying Plaintiff's motion for leave to file a supplemental complaint and motion for leave to file an amended complaint.  (Dkt. 39).  Plaintiff filed objections to Judge Scott's Decision and Order on February 15, 2019.  (Dkt. 41).[2]  Defendant responded to Plaintiff's objections on February 14, 2019.  (Dkt. 46).  With leave of the Court (Dkt. 49), Plaintiff filed a reply in further support of his objections on April 11, 2019.  (Dkt. 51).

On July 8, 2019, Plaintiff filed a motion for discovery.  (Dkt. 52).  Judge Scott entered a Text Order denying Plaintiff's motion for discovery without prejudice on August 26, 2019.  (Dkt. 55).  Plaintiff filed objections to Judge Scott's Text Order on September 6, 2019.  (Dkt. 56).  Defendant did not file a response to these objections.

Defendant filed her pending motion for summary judgment on January 13, 2020. (Dkt. 59).  Plaintiff filed his opposition on February 14, 2020.  (Dkt. 61).  Defendant filed a reply on March 3, 2020 (Dkt. 64) and Plaintiff filed a sur-reply on March 5, 2020 (Dkt. 65).[3]

---

[2]     The Court received a second copy of Plaintiff's objections on February 22, 2019. (Dkt. 43).

[3]     Plaintiff did not receive permission from the Court to file a sur-reply.  Nonetheless, in light of his *pro se* status, the Court has considered his sur-reply in deciding Defendant's motion for summary judgment.

## DISCUSSION

### I.    Plaintiff's Motions for Leave to File

The Court considers first Plaintiff's objections to Judge Scott's denial of his motions for leave to file a supplemental complaint and leave to file an amended complaint. "The Second Circuit has stated, albeit in dicta, that a motion to amend is a 'nondispositive' matter which can be determined by a magistrate judge, pursuant to Fed. R. Civ. P. 72(a), subject to review under the 'clearly erroneous' standard set out therein." *Coral Crystal, LLC v. Fed. Ins. Co*., No. 17-CV-1007 LTS BCM, 2021 WL 84308, at *1 n.1 (S.D.N.Y. Jan. 11, 2021) (citing *Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007)). However, some courts in this Circuit have determined that "a denial of leave to amend premised on 'futility' is akin to the grant of a motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(6) and should therefore be deemed dispositive, requiring *de novo* review pursuant to Rule 72(b)." *Id*. (collecting cases). In this case, regardless of the standard applied, the Court finds no error in Judge Scott's denial of Plaintiff's motions for leave to file.

"Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." *Murdaugh v. City of New York*, No. 10 CIV. 7218 HB, 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011); *see also Lucente v. Int'l Bus. Machines Corp*., 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." (citation omitted)). Here, Judge Scott correctly found that Plaintiff's proposed additional allegations regarding the incidents in May 2018 did not state a cognizable claim.

- 7 -

(Dkt. 39 at 3).  As Judge Scott explained, Plaintiff does not allege that he was actually given medical treatment against his will on any occasion in May 2018, nor does he allege that he was punished for his refusal to accept any such treatment.  (*Id.* at 3).  While Plaintiff has a constitutional right to refuse medical treatment, he does not have a right to dictate the timing of medical appointments that his treatment providers feel are necessary (as opposed to declining to attend such appointments), nor is he entitled to choose a particular treatment provider.  *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment."); *Torricellas v. Bedford*, No. EDCV 14-2489 AG AJW, 2016 WL 11518597, at *5 (C.D. Cal. July 27, 2016) ("[A]n inmate does not have a constitutional right to receive medical treatment from the physician or other medical provider of his or her choice.").  Accordingly, Judge Scott correctly denied Plaintiff leave to file either a supplemental complaint or an amended complaint on the basis of futility.

## II.   Plaintiff's Motion for Discovery

The Court turns next to Judge Scott's denial of Plaintiff's motion for discovery.  In his motion for discovery, Plaintiff requested the following items: (1) "a copy of the names of all medical providers that worked in Room 220 of the Wende Correctional Facility RMY from 7-21-16 through 7-22-16"; (2) all of his medical records "from the date of 7-6-16 through 7-20-16"; and (3) all of his medical records from the Monroe County Jail "from the date of 10-1-16 through 10-1-17." (Dkt. 52 at 1).  Judge Scott denied Plaintiff's motion without prejudice, noting that (1) Defendant's initial disclosures (Dkt. 53) appeared

sufficient to  respond to Plaintiff's requests and (2) if that was not the case, Plaintiff could renew his requests during the discovery period to the extent necessary.  (Dkt. 55).

Magistrate judges' decisions concerning discovery are nondispositive and reviewed for clear error.  *Sampedro v. Silver Point Capital, L.P.*, 958 F.3d 140, 143 n.1 (2d Cir. 2020).  Here, the Court finds no error, clear or otherwise, in Judge Scott's denial without prejudice of Plaintiff's motion for discovery.  As Judge Scott noted, as part of her initial disclosures under Federal Rule of Civil Procedure 26, Defendant produced a complete copy of Plaintiff's medical records.  (*See* Dkt. 53 at 3).  To the extent that Plaintiff felt this requests were not answered by those records, Judge Scott afforded him the opportunity to file a renewed motion for discovery.

Plaintiff argues in his objections that the medical records produced by Defendant did not fully respond to his discovery requests, because the signatures and "RN numbers" of the medical providers who worked in Room 220 of the Wende infirmary "are not written or printed clearly."  (Dkt. 56 at 2).  However, the records submitted by Plaintiff in support of this argument are legible.  (*Id*. at 4-5).  Further, Plaintiff did not raise this argument in front of Judge Scott before filing his objections, even though Judge Scott expressly stated that Plaintiff could renew his discovery requests to the extent that they were not fully answered by Defendant's initial disclosures.  "[A] party waives any arguments not presented to the magistrate judge."  *Castorina v. Saul*, No. 19-CV-991 AJN BCM, 2020 WL 6781078, at *1 (S.D.N.Y. Nov. 18, 2020) (citation omitted).  The Court finds no basis to disturb Judge Scott's ruling on Plaintiff's motion for discovery.

### III.   Defendant's Motion for Summary Judgment

#### A.   Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654

F.3d at 358.  Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### B.  <u>Defendant is Entitled to Qualified Immunity</u>

In support of her motion for summary judgment, Defendant argues both that Plaintiff was not deprived of his right to refuse medical treatment and that she is in any event entitled to qualified immunity.  (Dkt. 59-1).  For the reasons discussed below, the Court agrees that Defendant is entitled to qualified immunity, and accordingly need not reach Defendant's other arguments.

"Qualified immunity insulates public officials from claims for damages where their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Defore v. Premore*, 86 F.3d 48, 50 (2d Cir. 1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Court "must look to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful."  *Ford v. McGinnis*, 352 F.3d 582, 596-97 (2d Cir. 2003) (quotation omitted).

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful."  *District of Columbia v. Wesby*, ─── U.S. ───, 138 S. Ct. 577, 589 (2018) (quotation omitted).  "This demanding standard protects all but the plainly incompetent or

those who knowingly violate the law." *Id.* (quotation omitted). "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589-90 (citation and quotations omitted). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590.

There is no question that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990). This interest extends to prisoners, *id.*, but "[t]he prisoner's . . . right to refuse [medical] treatment must be balanced against the state's interest in effective prison administration," *Pabon v. Wright*, 459 F.3d 241, 252 (2d Cir. 2006). Accordingly, "a prisoner's right to refuse medical treatment need not be honored if legitimate penological interests require the prisoner to be treated." *Id.* "Obvious examples" of situations in which prison officials may override a prisoner's refusal of medical treatment" include "the treatment of an infectious disease, avoidance of contaminations, or prevention of disruption by illness-induced behaviors." *Id.*

In this case, Plaintiff was concededly experiencing a hypertensive crisis on July 21, 2016, which carried with it the risk of catastrophic complications including death. The gravamen of his claim against Defendant is that she coerced him into accepting treatment by admitting him to the infirmary against his will.

Assuming, for the sake of argument, that it is a violation of a prisoner's Fourteenth Amendment rights to require him to stay in the infirmary for observation while he is

experiencing a medical crisis for which he has refused medication, the Court finds that such rule was indisputably not clearly established in July 2016.

First, it is not clear that admission to the infirmary, without more, constitutes medical treatment. *See, e.g., Klein v. MHM Corr. Servs., Inc.*, No. C.A. 08-11814-MLW, 2010 WL 3245291, at *6 (D. Mass. Aug. 16, 2010) ("[I]t is far from clear that [the defendant's] asking questions and observing plaintiff's behavior, while not consensual, could constitute 'medical treatment' within the meaning of *Cruzan*[.]"); *Starks v. Couch*, No. CIV.08-CV-407-GPM, 2009 WL 331357, at *2 (S.D. Ill. Feb. 11, 2009) (placing a prisoner on suicide watch did not violate his right to refuse medical treatment). It is well-established that a prisoner has no constitutional right to dictate where he is housed within a prison. *See Allah v. Ryan*, 436 F. Supp. 3d 621, 629 (W.D.N.Y. 2020) (collecting cases). Plaintiff has not cited, nor has the Court uncovered in its own research, any cases in which a court has determined that requiring a prisoner to remain in the infirmary while experiencing a medical crisis constitutes forced medical treatment.

Second, even assuming that requiring Plaintiff to remain in the infirmary constituted "medical treatment," it was not clearly established in July 2016 whether Plaintiff's right to refuse this treatment was outweighed by prison officials' legitimate penological interests in not having prisoners experiencing life-threatening medical crises in the general population. As noted above, the Second Circuit has affirmatively stated that an "obvious example" of a case in which prison officials may override a refusal of medical treatment is to prevent "disruption by illness-induced behaviors." *Pabon*, 459 F.3d at 252. Here, it is undisputed that Plaintiff was experiencing a hypertensive crisis that put him at immediate

risk of stroke, heart attack, and/or death.  It would have been extremely disruptive to the prison environment had Plaintiff been sent back to the general population only to experience one of these catastrophic medical events, potentially in a communal area.  In other words, it is not at all clear that a prisoner's right to refuse potentially life-saving medical treatment carries with it a right to demand that he be allowed to return to his normal activities, as opposed to being housed in the infirmary until the immediate crisis has passed. *Cf. McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (prisoner who had tested positive for tuberculosis was entitled to refuse treatment and could not be forcibly medicated, but could nonetheless be "confined for medical observation for signs of the active disease").

Finally, with respect to Plaintiff's claim that he was coerced, against his will, into taking medication and allowing his blood pressure to be monitored, the only "coercion" of which there is any evidence is Defendant's admission of Plaintiff to the infirmary.[4]  It was not clearly established in July 2016 that holding Plaintiff in the infirmary constituted impermissible coercion, as opposed to permissible consequence of Plaintiff's refusal of treatment.  Federal courts have held that medical "professionals enjoy wide latitude to offer

---

[4]    Plaintiff did claim in his Form 3195 statement that he feared being given a disciplinary "ticket" for refusing a direct order if he did not take the medications that had been prescribed.  However, Plaintiff concedes that Defendant never threatened him with such a "ticket," instead arguing that it is "common sense" that he could have been punished for insubordination and that Defendant was not required to "open . . . her mouth and tell" him as much.  (Dkt. 65 at 10-11).  Further, the record shows that Plaintiff had previously refused medical treatment on numerous occasions without any disciplinary action being taken.  (*See* Dkt. 59-3 at 78, 80, 82, 87, 90, 92-93, 108, 112, 136).  Plaintiff's unsupported speculation that he would be disciplined if he continued to refuse medical treatment is not evidence of coercion on the part of Defendant.

patients incentives to comply with treatment" and that it is accordingly not a constitutional violation to, for example,  restrict a prisoner's access to a computer as a result of his refusal to participate in mental health treatment, *Montin v. Gibson*, No. 4:09CV3153, 2012 WL 3202461, at *7 (D. Neb. Aug. 6, 2012), or to revoke other quality of life privileges for "refusing to participate in medical and mental health treatment," *LaRue v. Matheney*, No. CIV.A. 2:08-00983, 2010 WL 786249, at *8 (S.D.W. Va. Mar. 4, 2010) ("While an inmate has a right, under most circumstances, to refuse sex offender treatment, the inmate does not have a cause of action to avoid the consequences of such refusal, such as loss of privileges."), *aff'd*, 385 F. App'x 328 (4th Cir. 2010).  Further, Plaintiff concedes in his papers that Defendant had indicated he could be released from the infirmary once his blood pressure "was considered to be stable."  (Dkt. 61-1 at ¶ 36).  It was not clearly established in July 2016 that restricting Plaintiff to the infirmary until his medical crisis passed was an impermissible consequence of the refusal to accept medical treatment.

The Court notes that the Second Circuit has held that prison officials may not withhold necessary medical treatment unless an inmate agrees to undergo other treatment that he has refused.  *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000) (finding rational jury could conclude the defendant was deliberately indifferent to the plaintiff's serious medical needs where the defendant refused to treat the plaintiff's cavity for one year because the plaintiff would not consent to the extraction of a different tooth).  However, there is a significant difference between refusing needed medical treatment in an effort to force a prisoner to accept unwanted medical treatment and the facts presented here.  In particular, the *Harrison* court's decision was based on the plaintiff's independent

constitutional right to medical treatment, *id*. at 138, where here, as discussed above, there is no independent constitutional right to be housed in any particular part of the prison. *Harrison* does not clearly establish that Plaintiff had a right not to be admitted to the infirmary once he refused medical treatment.

For all these reasons, the Court finds that, even viewing the evidence in the light most favorable to Plaintiff and resolving all disputes in his favor, no rational jury could conclude that a reasonable person in Defendant's position would have thought that her actions were unlawful.  As such, Defendant is entitled to qualified immunity and Plaintiff's claim against her must be dismissed.

## CONCLUSION

For the foregoing reasons the Court: (1) denies Plaintiff's objections (Dkt. 41) to Judge Scott's Decision and Order dated February 5, 2019 (Dkt. 39) denying Plaintiff's motions for leave to file amended and supplemental complaints (Dkt. 22; Dkt. 26); (2) denies Plaintiff's objections (Dkt. 56) to Judge Scott's Text Order dated August 26, 2019 (Dkt. 55) denying without prejudice Plaintiff's motion for discovery (Dkt. 52); and (3) grants Defendant's motion for summary judgment (Dkt. 59).  The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: January 28, 2021
        Rochester, New York

- 16 -